UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
JASON BAKER, JOHN BREWSTER, JOANN  BREWSTER,
MAXINE CONDON, KAREN FARRELL, BROOKS           Case No. 6:11-CV-06119
LIDDIARD, JANET LIDDIARD, JAMES MCDERMOTT,         (CJS)(JWF)
HEIDI MCDERMOTT, PAUL MOREY, DONETTA
MOREY, JOE TODD, BONNIE TODD, TOM WHIPPLE and   Hon. Charles J. Siragusa
PAULINE WHIPPLE,

Plaintiffs,

-against -

ANSCHUTZ EXPLORATION CORPORATION, CONRAD
GEOSCIENCE CORPORATION, PATHFINDER ENERGY
SERVICES, INC. and JOHN and JANE DOES 1 through 100,

Defendants.
------------------------------------------------------------------------X

## PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION TO STRIKE AND/OR DISMISS PURSUANT TO RULES 16(F) AND 37(B)

*Of Counsel*
   Tate J. Kunkle

Napoli Bern Ripka Shkolnik & Assoc., LLP
*Attorneys for Plaintiffs*
350 Fifth Avenue, Suite 7413
New York, New York  10118
Ph.:  (212) 267-3700
Fax:  (212) 587-0031

**TABLE OF CONTENTS**

TABLE OF CONTENTS....................................................................................................... i

TABLE OF AUTHORITIES .............................................................................................. ii

PRELIMINARY STATEMENT ........................................................................................ 1

PROCEDURAL HISTORY................................................................................................ 1

FACTUAL BACKGROUND ............................................................................................. 2

LEGAL STANDARD......................................................................................................... 7

ARGUMENT .................................................................................................................... 10

      PLAINTIFFS FULLY COMPLIED WITH THE REQUIREMENTS OF
THE MSO. ....................................................................................................................... 10

          A.     Plaintiffs' expert reports sufficiently and appropriately
address plaintiffs' discovery obligations under the Modified
Scheduling Order (Doc. 83)..................................................................... 11

          B.     The sanctions defendants seek are particularly harsh and
disproportionate in light of plaintiffs' submittals. .................................. 14

CONCLUSION................................................................................................................. 18

## TABLE OF AUTHORITIES

# CASES

*Aktas v. JMC Development Co., Inc.*,
  2012 WL 2522648 (N.D.N.Y. Jun. 28, 2012) ............................................................ 9

*Altschuler v. Samsonite Corp.*,
  109 F.R.D. 353 (E.D.N.Y. Jan. 23, 1986) ................................................................ 9

*Baba v. Japan Travel Bureau Intern., Inc.*,
  111 F.3d 2 (2nd Cir. 1997) ...................................................................................... 10

*Bartnick v. CSX Transportation, Inc.*,
  2013 WL 1113991 (N.D.N.Y. Mar. 18, 2013) ......................................................... 17

*DePalma v. Nike, Inc.*,
  1998 WL 690880 (N.D.N.Y. Sept. 30, 1998) ........................................................... 17

*DiPirro v. United States*,
  43 F.Supp.2d 327 (W.D.N.Y. Feb. 26, 1999) ............................................................ 8

*Dunbar v. Ballymore Co.*,
  1991 WL 273302 (N.D.N.Y. Dec. 19, 1991) .............................................................. 8

*Georgiadis v. First Boston Corp.*,
  167 F.R.D. 24 (S.D.N.Y. May 30, 1996) ................................................................. 10

*Hinton v. Patnaude*,
  162 F.R.D. 435 (N.D.N.Y. Aug. 2, 1995) .................................................................. 8

*In re Exxon Valdez*,
  102 F.3d 429 (9th Cir. 1996) ................................................................................... 9

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*,
  591 F. Supp. 2d 259 (S.D.N.Y. 2008) .................................................................... 16

*In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*,
  739 F. Supp. 2d 576 (S.D.N.Y. 2010) .................................................................... 17

*LaVigna v. State Farm Mut. Auto. Ins. Co.*,
  736 F.Supp.2d 504 (N.D.N.Y. Aug. 24, 2010) .......................................................... 8

*Lore v. Lone Pine Corp.*,
  No. L-33606-85, 1986 WL 637507, *1 (N.J. Super. Nov. 18, 1986) ...................... 15

*McNerney v. Archer Daniels Midland Co.*,
  164 F.R.D. 584 (W.D.N.Y. Dec. 22, 1995) .............................................................. 8

*Morales v. Robert Fleming, Inc.*,
  1989 WL 303516 (S.D.N.Y. Oct. 30, 1989) .............................................................. 9

*Nat'l Hockey League v. Metro. Hockey Club, Inc.*,
  427 U.S. 639 (1976) ................................................................................................ 9

*Optigen, LLC v. Int'l Genetics, Inc.*,
  877 F.Supp.2d 33 (N.D.N.Y. Jul. 2, 2012) ............................................................ 8

*People v. Sadacca*,
  128 Misc. 2d 494 (Sup. Ct., N.Y. Cty., 1985) .................................................... 16

*Rivera v. Heyman*,
  1997 WL 86394 (S.D.N.Y. Feb. 27, 1997) ............................................................ 7

*Sawyer* v. *Wight*,
  196 F. Supp. 2d 220 (E.D.N.Y. 2002) ............................................................ 11, 16

*Spence v. Maryland Cas. Co.*,
  803 F.Supp. 649 (W.D.N.Y. Aug. 26, 1992) *aff'd,* 995 F.2d 1147 (2d
  Cir. 1993) ...................................................................................................... 9, 15

*Strudley v. Antero Res. Corp.,*
  No. 2011-CV-2218 (Colo. Dist. Ct. May 9, 20120) ............................................ 15

## STATUTES

Fed. R. Civ. P. 16(f) ............................................................................................ 7, 16

Fed. R. Civ. P. 26(a) ............................................................................................ 7, 8

Fed. R. Civ. P. 26(e) ............................................................................................... 7

Fed. R. Civ. P. 37 ........................................................................................ 8, 9, 10

Fed. R. Civ. P. 37(b) ............................................................................................ 7, 16

Fed. R. Civ. P. 37(c) ............................................................................................... 7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------X
JASON BAKER, JOHN BREWSTER, JOANN  BREWSTER,
MAXINE CONDON, KAREN FARRELL, BROOKS LIDDIARD,     Case No. 6:11-CV-
JANET LIDDIARD, JAMES MCDERMOTT, HEIDI            06119
MCDERMOTT, PAUL MOREY, DONETTA MOREY, JOE
TODD, BONNIE TODD, TOM WHIPPLE and PAULINE         (CJS)(JWF)
WHIPPLE,
                                                  Hon. Charles J.
                              Plaintiffs,         Siragusa

-against -

ANSCHUTZ EXPLORATION CORPORATION, CONRAD
GEOSCIENCE CORPORATION, PATHFINDER ENERGY
SERVICES, INC. and JOHN and JANE DOES 1 through 100,

                              Defendants.
-------------------------------------------------------------------------X

## PRELIMINARY STATEMENT

Plaintiffs, Jason Baker et al., respectfully submit this Memorandum of Law in opposition

to defendants Anschutz Exploration Corporation's ("Anschutz") and Pathfinder Energy Services,

Inc.'s ("Pathfinder") (collectively "defendants") Motion to Strike and/or Dismiss Pursuant to

Rules 16(f) and 37(b) of the Federal Rules of Civil Procedure ("FED. R. CIV. P.") (the

"Motion").  Plaintiffs respectfully request that defendants' Motion be denied in its entirety.

## PROCEDURAL HISTORY

Defendants' Motion arises from plaintiffs' Complaint against the defendants named

therein for the contamination of their groundwater supplies from defendants' natural gas

exploration and drilling activities.  Plaintiffs filed suit against defendants in the Supreme Court

of the State of New York, Chemung County on February 11, 2011.  Plaintiffs have brought

claims of negligence, negligence per se, private nuisance, premises liability, trespass, strict

liability under New York State Navigation Law Article 12, abnormally dangerous activity and absolute and strict liability.

On September 25, 2012 the Court entered a Modified Scheduling Order (Doc. 83) (the "MSO").  The MSO required both plaintiffs and defendants to submit expert report(s) addressing, among other things, causation and the identity of the polluting substances plaintiffs claim is attributable to defendants' operations, prior to engaging in depositions.

Plaintiffs served their expert reports as required by the MSO on March 12, 2013 and defendants served their rebuttal expert reports on April 5, 2013, even though the MSO ordered for simultaneous exchange.  On April 22, 2013, defendants filed the instant Motion (Doc. 102), seeking to strike plaintiffs' expert reports and/or dismiss their Complaint as non-compliant with the Court's MSO.  This Memorandum is respectfully offered as Plaintiffs' Response and Opposition thereto.

## FACTUAL BACKGROUND

Plaintiffs are owners and residents of nine (9) properties forced to file suit to recover damages arising from the contamination of their groundwater supplies and residential properties from the drilling and operations of two (2) natural gas wells drilled by defendants.  The gas wells, collectively referred to as the "Dow Wells," were drilled in the Township of Big Flats, in Chemung County, New York in close proximity to properties owned by the plaintiffs (whereupon they also reside).  Compl. ¶85.  After defendants vertically drilled the Dow Wells, they drilled the gas wells horizontally for the purpose of extracting natural gas.  Compl. ¶88.  Plaintiffs contend that one of the Dow Wells, the Dow #1 Well, was defectively drilled beneath plaintiffs' properties.

As long as plaintiffs have resided in Chemung County, they have relied on groundwater wells as their sole source of clean water for drinking, cooking, washing, bathing and other daily

residential uses.  Compl. ¶92.  In order to obtain the legal right to recover the natural gas beneath

plaintiffs' properties, defendant Anschutz entered into oil and gas leases with plaintiffs.  Compl.

¶93.  Each oil and gas lease was solicited by an agent or employee of defendant Anschutz, who

represented to plaintiffs that their properties would remain the same after the Dow Wells were

drilled.  Compl. ¶¶ 94-95.

Defendants' negligent actions in the course of the gas well construction and drilling

caused the migration of gas and other contaminants to enter the aquifer where plaintiffs' wells

draw groundwater; thus contaminating their water supply.  For example, on May 1, 2010,

defendants recorded that a surface casing leak in the Dow 1 Well existed between 582 feet and

674 feet, requiring remedial "squeeze cementing" procedures to correct the leak.[1]  Similarly, on

May 30, 2010, the 7-inch intermediate casing was set from 5,538 feet to 10,072 feet and

problems were caused when defendants' casing packer set prematurely prior to the cementing.[2]

This precluded a standard cementing job that would have conformed to industry standards.

Instead, defendants attempted to remediate this defect by squeezing cement at the casing shoe by

installing a cement retainer and perforated the casing.[3]  The Dow #1 Well continued to

experience various issues through November and December 2010 resulting in leaks and openings

in the casing that was supposed to protect the groundwater from defendants' contaminants and

natural gas that was supposed to be coming to the surface inside the well.[4]  From the time the 7-

inch intermediate casing was run in May 2010, a leak likely existed until it was finally squeezed

---

[1] *See* Affidavit of Gary Gartenberg, P.E. at 3, annexed to the Declaration of Tate J. Kunkle as **Exhibit "1"**.

[2] *Id.*

[3] *Id.*

[4] *Id.*

3

in December 2010.[5]  These defects and defendants' gas well drilling activities have resulted in

significant unnatural change to the chemistry of the groundwater, such that plaintiffs' water

supply is now degraded and no longer suitable and safe for use.[6]

Defendants did not conduct any pre-drill sampling of plaintiffs' water supplies.

However, sampling conducted between 1998 and 2007 of the adjacent trailer park community's

(Thunderbird Greens) groundwater shows that the groundwater in and around the Big Flats area

was generally of good quality and that the water chemistry was stable.[7]  Plaintiffs' groundwater,

on the other hand, has significantly degraded in quality and the water chemistry has become

unstable since defendants began drilling and constructing the Dow Wells.  For example, Plaintiff

Joseph Todd reported to the New York State Department of Environmental Conservation

("NYSDEC") that on September 9, 2010, his water was cloudy and methane bearing, and that the

sediment in his water was black.[8]  For forty-six (46) years before this, there was no sediment

present in Mr. Todd's water.[9]  On October 13, 2010, Mr. Todd installed a particulate filter in an

attempt to ameliorate the sediment issues in his water.[10]  Mr. Todd had to change a three-month

sediment filter *on almost a daily basis* throughout the remainder of October 2010.[11]

---

[5] *Id.*

[6] *See* Affidavit of Paul A. Rubin, at 1 ¶4, annexed to the Declaration of Tate J. Kunkle as **Exhibit "2"**.

[7] *See* Groundwater Results for Thunderbird Greens, annexed to the Declaration of Tate J. Kunkle as **Exhibit "3"**.

[8] *See* Affidavit of Paul A. Rubin, at 2 ¶5, annexed to the Declaration of Tate J. Kunkle as **Exhibit "2"**.

[9] *Id.*

[10] *Id.*

[11] *Id.*

Similarly, the Farrell plaintiffs reported to the NYSDEC on October 18, 2010, that they had been having sediment problems for at least several weeks but never before previously.[12]  On November 12, 2010, the Morey plaintiffs reported to the NYSDEC that their water was fizzy, milky and dirty.[13]  Sample photographs provided by plaintiffs show the visual quality of their water in 2010 and 2011, and the staining of their household appliances.[14]  Water sampling results from April 28, 2011, for the Condon plaintiffs' water well revealed that sodium levels were so high that they exceeded the secondary water regulation guideline level by a factor of 18 times or 1,825 percent (sodium was detected at 365 milligrams per liter [mg/l] of water or parts per million).[15]

The negligent drilling of the Dow #1 Well resulted in the opening and interconnecting of formerly isolated pathways for gas and some drilling fluid migration.[16]  "Natural gas will follow open borehole and fracture pathways to release locations with lower pressure.  [Plaintiffs' water] wells have provided the endpoints of some of these pathways."[17]  As a result, methane levels for many of the plaintiffs' water wells were extremely high when sampled in April 2011.[18]  The high methane concentrations found in some of plaintiffs' water wells that had never before occurred, "resulted when one or both of the Dow gas wells, most likely the Dow #1 well, interconnected bedrock fractures and faults with the open boreholes present in [plaintiffs' [water] wells."[19]

---

[12] *Id.*

[13] *Id.*

[14] *See* Plaintiffs' Photographs, annexed to the Declaration of Tate J. Kunkle as **Exhibit "4"**.

[15] *See* Affidavit of Paul A. Rubin, at 4 ¶13, annexed to the Declaration of Tate J. Kunkle as **Exhibit "2".**

[16] *Id*. at 9 ¶24.

[17] *Id.* ¶26.

[18] *Id*. at 10 Table 3: Methane concentrations in plaintiffs' wells.

[19] *Id*. ¶29.

On November 20, 2012, plaintiffs' expert Hydrogeologist and Hydrologist, Paul Rubin,[20] visited four (4) plaintiffs' homes for inspections and field parameter measurements of their water supplies.[21]  The field parameters he measured were pH, total dissolved solids ("TDS"), specific conductance ("SC"), and groundwater temperature.  In Mr. Rubin's opinion, "the high TDS and SC values documented in plaintiff Condons' water well clearly point out that something has adversely impacted the water chemistry and that there is cause for concern."[22]  Mr. Rubin also provides that "the unusually high pH of well waters, some above the 8.5 standard, strongly suggests that gas field chemicals have changed the pH and natural chemistry of groundwater tapped by [plaintiffs]."[23]

"What is normally a chemically stable and predictable groundwater composition over thousands of years is now changing, highly variable and exhibits chemical concentrations in violation of State and Federal groundwater standards."[24]  This inconsistency in the contaminants in their water puts plaintiffs "in the position of not knowing whether ingestion of their water might pose a health risk on a daily basis."[25]  Furthermore, the high methane concentrations "pose an explosive hazard to some" of the plaintiffs.[26]  Plaintiffs no longer enjoy their property as they

---

[20] Mr. Rubin is a Hydrogeologist and Hydrologist with thirty (30) years of professional experience.  Within the broad field of hydrogeology, he has specialized expertise in both surface water and groundwater hydrology.  He also has specialized expertise in contaminant transport in fractured bedrock, unconsolidated and karts aquifers.  *See* Affidavit of Paul A. Rubin, at 1 ¶¶ 1-2, annexed to the Declaration of Tate J. Kunkle as **Exhibit "2."**

[21] *See* Affidavit of Paul A. Rubin, at 2 ¶6, annexed to the Declaration of Tate J. Kunkle as **Exhibit "2".**

[22] *Id.*

[23] *Id.*

[24] *Id.* at 11 ¶30.

[25] *Id.*

[26] *Id.*

once did and their right to the exclusive possession of their property (*i.e.* groundwater) has been violated by defendants.

Clean water is a basic, precious natural resource and a fundamental commodity of incalculable value.  Plaintiffs have a right to clean water.  Compl. ¶102.  Unfortunately, plaintiffs can no longer drink their groundwater because the aquifer underlying their properties has become contaminated with combustible gases, toxic sediments, heavy metals and hazardous chemicals as a result of defendants' negligent drilling and construction activities in their quest for profit for their shareholders.  Compl. ¶96.  Plaintiffs' water wells are now contaminated with explosive levels of natural gas and other foreign chemicals and minerals that were never in their water before or if they did exist, they were at much lower levels.

## LEGAL STANDARD

Defendants move to strike plaintiffs' expert reports and/or to dismiss plaintiffs' actions for plaintiffs' failure to comply with the MSO under FED. R. CIV. P. 16(f), FED. R. CIV. P. 37(b). It is well established that a United States District Court enjoys "considerable discretion to control the discovery process in cases before it."  *Rivera v. Heyman*, 1997 WL 86394, *1 (S.D.N.Y. Feb. 27, 1997).  The Federal Rules of Civil Procedure "allow a court to impose sanctions if a party fails to obey a scheduling order or other pretrial order."  FED. R. CIV. P. 16(f)(1)(C).  Such sanctions may include "prohibiting the disobedient party from supporting or opposing designated claims or defenses, or from introducing designated matters in evidence," "dismissing the action or proceeding in whole or in part" or "rending a default judgment against the disobedient party." FED. R. CIV. P. 37(b)(2)(A)(ii, v and vi).

In federal cases, the disclosure of experts and expert reports are generally governed by Rules 26(a), 26(e) and 37(c).  FED. R. CIV. P. 26(a), 26(e), and 37(c).  Generally, the preclusion of expert reports "is a *drastic remedy and should only be applied* in cases where the party's

conduct represents flagrant bad faith and callous disregard for the requirements of Rule 26(a)(2)(B).” *DiPirro v. United States*, 43 F.Supp.2d 327, 340 (W.D.N.Y. Feb. 26, 1999) (emphasis added).  District courts in the Second Circuit have held that “preclusion of expert testimony is generally ordered *only* where the court finds that the party’s failure to comply with the requirements was both unjustified and prejudicial.” *Id*. (citing *McNerney v. Archer Daniels Midland Co.,* 164 F.R.D. 584, 587 [W.D.N.Y. Dec. 22, 1995]; *Hinton v. Patnaude,* 162 F.R.D. 435, 439 [N.D.N.Y. Aug. 2, 1995]; *Kolt v. United States,* 1998 WL 214826 [W.D.N.Y. April 24, 1998]) (emphasis added).

District courts in the Second Circuit have stated that preclusion of an expert report “is a somewhat harsh remedy, because of its obvious effect of depriving the court and finder of fact of otherwise potentially relevant information to be used in deciding the issues in the case.” *Optigen, LLC v. Int'l Genetics, Inc.*, 877 F.Supp.2d 33, 49 (N.D.N.Y. Jul. 2, 2012) (citing *LaVigna v. State Farm Mut. Auto. Ins. Co.,* 736 F.Supp.2d 504, 511 [N.D.N.Y. Aug. 24, 2010]). *See also Dunbar v. Ballymore Co.*, 1991 WL 273302 (N.D.N.Y. Dec. 19, 1991) (“[T]his court is of the opinion that where both parties concede that the evidence sought to be excluded is critical to the case and disclosure of the evidence, although untimely, ultimately is achieved in advance of trial, exclusion is an unduly harsh sanction.”).

Under Rule 37, a party may move for the imposition of sanctions against the opposing party for failure to make disclosures or to cooperate in discovery.  FED. R. CIV. P. 37.  District courts in the Second Circuit have held that “[i]mposition sanctions under FED. R. CIV. P. 37 is [] a *drastic remedy* and should *only* be applied in those *rare cases* where a party's conduct represents bad faith and callous disregard of the Federal Rules of Civil Procedure.”  *Optigen, LLC*, 877 F.Supp. 2d at 49.  The drastic remedy of dismissal for discovery violations, even in

circumstances evincing gross negligence, should rarely be employed. *Aktas v. JMC Development Co., Inc.*, 2012 WL 2522648 (N.D.N.Y. Jun. 28, 2012) (Dismissal of suit was too drastic a remedy for spoliation of evidence). Indeed, "[a] primary purpose of the Federal Rules of Civil Procedure is to promote the ends of justice by granting litigants their day in court." *Morales v. Robert Fleming, Inc.*, 1989 WL 303516, *3 (S.D.N.Y. Oct. 30, 1989).

The sanction of dismissal of a case for failure to comply with a discovery order, the "most severe in the spectrum of sanctions" under Rule 37 is available to district courts "in appropriate cases, not merely to penalize those whose conduct may be deemed to warrant such action, but to deter those who might be tempted to such conduct in the absence of such a deterrent." *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 642 (1976). "[I]t is well settled law in [the Second] Circuit that dismissal under FED. R. CIV. P. 37 is a drastic penalty which should be imposed only in extreme circumstances." *Spence v. Maryland Cas. Co.*, 803 F.Supp. 649, 661 (W.D.N.Y. Aug. 26, 1992) *aff'd* 995 F.2d 1147 (2d Cir. 1993). In this regard, "the function of a district court is to determine whether the party moved against has demonstrated a flagrant disregard of court orders, before it may grant a drastic remedy such as dismissal…" *Id.*

Typically, dismissals under Rule 37 are limited to those cases where there is a flagrant and absolute failure to obey court discovery orders or when a party failed to comply with a court's discovery order after being warned that failure to comply would result in dismissal of its case. *See, e.g., Altschuler v. Samsonite Corp.*, 109 F.R.D. 353, 356 (E.D.N.Y. Jan. 23, 1986) (dismissal of third-party complaint warranted because of third-party plaintiff's "consistent failure to cooperate in [the] litigation in good faith and to obey a discovery order of which it had proper notice"). *See also In re Exxon Valdez*, 102 F.3d 429, 433 (9th Cir. 1996) (dismissal upheld as

discovery sanction as the district court found that "[i]t [was] undisputed that [plaintiffs'] failure to respond to discovery and to comply with the orders to do so was knowing and deliberate."); *Georgiadis v. First Boston Corp.*, 167 F.R.D. 24 (S.D.N.Y. May 30, 1996) (dismissal of plaintiff's case for its repeated failures to comply with discovery orders and the court warned that noncompliance could result in dismissal); *Baba v. Japan Travel Bureau Intern., Inc.*, 111 F.3d 2, 5 (2nd Cir. 1997) (sanction of dismissal under Rule 37 was "perfectly appropriate" where plaintiff persistently failed to comply with discover orders and the district court warned numerous times of dismissal for noncompliance).

## ARGUMENT
### PLAINTIFFS FULLY COMPLIED WITH THE REQUIREMENTS OF THE MSO.

This Court entered the Modified Scheduling Order (Doc. 83) (the "MSO") that is the subject of defendants' instant motion to govern the second phase of discovery in the subject litigation.  MSO at 1.[27]  It required plaintiffs to provide defendants with the following:

1. Expert opinion(s) provided by way of expert report(s)…that establish for Plaintiffs: (a) the identity of each and every hazardous substance to which Plaintiffs claim exposure as a result of Defendants' activities; (b) if other than the Plaintiffs' residences, the precise location of any claimed exposure; and (c) an explanation of causation.

2. Each and every study, report, and analysis that contains any findings of contamination on Plaintiffs' property or at the point of each Plaintiff's claimed exposure to the extent not already provided.

3. Identification and quantification of contamination of the Plaintiffs' real property that Plaintiffs' claim is attributable to Defendants' operations.

MSO at 1-2.

---

[27] In the first phase of discovery, the parties exchanged documents and conducted water sampling. (Doc. 29). Included in plaintiffs' production was all sampling data on plaintiffs' water and isotopic testing on the natural gas in plaintiffs' water wells carried out by the NYSDEC during their investigation.  No party depositions have been conducted to date.

In response to the MSO, plaintiffs submitted two (2) expert reports: one from Gary Gartenberg, a Licensed Professional Engineer with experience in the oil and natural gas industries; the other from Paul Rubin, a Hydrogeologist and Hydrologist with specialized experience in contaminant transport in fractured bedrock and aquifers; plaintiffs also proffered many documents as exhibits.  Defendants argue that plaintiffs' submissions "do not comply with the Court's [Modified Scheduling] order."  Def. Memo at 2.  Defendants' claim is without merit and is simply another effort to avoid being held liable for the damage they have caused to plaintiffs and the water underlying the State of New York.  Defendants' motion goes to the weight of plaintiffs' experts' submissions, something reserved for the province of the jury, and thus should be denied in its entirety.

Significantly, plaintiffs' submittals pursuant to the MSO provide *exactly* what the Court's MSO called for: they (1) identify the contaminants impacting plaintiffs' properties; (2) provide the explanation of causation; (3) support their findings by competent and rational explanations; and (4) cite to objective and empirical data.  Given the foregoing, defendants' Motion should be denied.

**A.      Plaintiffs' expert reports sufficiently and appropriately address plaintiffs' discovery obligations under the MSO.**

Defendants argue that plaintiffs' expert reports fail to satisfy requirements under the MSO for various evidentiary and factual reasons, and because, in defendants' opinion, causation cannot be established.  However, disputes in evidence are not grounds for sanctions, let alone a sanction of dismissal with prejudice.  Furthermore, the issue of proximate causation is for the trier of fact to resolve.  *Sawyer* v. *Wight*, 196 F. Supp. 2d 220, 227 (E.D.N.Y. 2002) (proximate causation is a jury question and inappropriate for a court to decide it as a matter of law).

Defendants also conveniently cherry-pick portions of plaintiffs' expert reports in an attempt to undermine the sufficiency of the opinions contained therein.

First, plaintiffs' expert Mr. Rubin, a Hydrogeologist with thirty (30) years of professional experience, clearly identified and quantified the substances contaminating plaintiffs' water supplies as called for in the MSO. His affidavit also made several causal connections, *not* solely based on timing as alleged by defendants, between plaintiffs' water contamination and the drilling and operations of the Dow Wells. For example, Mr. Rubin opined that:

1. The unusual high pH of the well waters, some above the 8.5 standard, strongly suggests that gas field chemicals have changed the pH and natural chemistry of groundwater tapped by [plaintiffs] (Rubin Report ¶7);

2. The field pH of the Todd and McDermott waters is unusually high…[t]o a reasonable degree of scientific certainty, the likely causes of the high pH of the Todd and McDermott water are Anschutz's use of sodium carbonate (also known as soda ash), sodium hydroxide (also known as caustic sode or lye [NaOH]), and sodium bicarbonate as drilling additives. Anschutz provided the names of these chemicals in a list of drilling fluid products used in [the] Dow wells (Rubin Report ¶8);

3. To a reasonable degree of scientific certainty, the likely causes of the elevated sodium (to 365 mg/l) and chloride (500 mg/l) concentrations in Condon water are Anschutz's use of sodium chloride and potassium chloride. Anschutz provided the names of these chemicals in their MSDS sheets (Rubin Report ¶13);

4. The April 28, 2011 Condon sodium level exceeds [the secondary water regulation] guideline level by a factor of 18 times or 1,825 percent. This provides documentation that Ms. Condon and others whose water has high sodium concentrations should not drink or expose themselves to their degraded groundwater without first consulting medical experts (Rubin Report ¶13);

5. [A] hydraulic connection exists between homeowner wells and one or both Dow Wells (Rubin Report ¶19);

6. Exhibits C and E, coupled with Rubin's observation, provide evidence of closely spaced open joint systems as likely contamination pathways (Rubin Report ¶20);

7. The drilling of the Dow gas wells has resulted in opening and interconnecting formerly isolated pathways for gas and some drilling fluid migration (Rubin Report ¶24);

8. High methane concentrations found in some Big Flats wells (*see* Table 3), and not previously observed, to a reasonable degree of scientific certainty, resulted when one or both Dow gas wells, most likely the Dow #1 well, interconnected bedrock

fractures and faults with the open boreholes present in homeowner wells (Rubin Report ¶29); and

9.      The variable nature of metals and chloride concentrations resulting from disruption of the natural groundwater chemistry places homeowners in the position of not knowing whether ingestion of their water might pose a health risk on a daily basis.  In addition, elevated natural gas concentrations pose an explosive hazard to some homeowners (Rubin Report ¶31).

In addition to the foregoing, Mr. Rubin also provided two (2) tables showing the defendants the specific contaminants detected in plaintiffs' groundwater supplies and the levels in which they were detected.  *See* Table 2 and Table 3 at p. 5 and 10 of the Rubin Report.  Mr. Rubin concluded, "to a reasonable degree of scientific certainty, that the groundwater chemistry within the freshwater aquifer has been adversely impacted as a result of Anschutz's natural gas drilling activities."[28]  In his expert opinion, "Anschutz's gas well development activities in Chemung County, NY have resulted in significant unnatural change to the chemistry of the groundwater, such that it is now degraded and no longer suitable and safe for use."[29]

Plaintiffs also disclosed the report of Gary Gartenburg, an engineer in the oil and gas drilling industry.  Mr. Gartenberg, after reviewing defendants' document production (depositions of defendants have not yet been permitted), opined that problems with defendants' Dow #1 Gas Well would have allowed natural gas and drilling fluids to escape the well bore between May and December 2010.[30]  Given the reports of both experts, and all of the exhibits annexed thereto, plaintiffs submit that they have more than satisfied the requirements of the MSO by: (1) identifying in a clear and concise manner each and every hazardous substance they and their properties have been exposed to; (2) provided the explanations of causation using both direct and

---

[28] *See* Affidavit of Paul A. Rubin, at 11 ¶31, annexed to the Declaration of Tate J. Kunkle as **Exhibit "2".**

[29] *Id*. At 1 ¶4.

[30] *See* Affidavit of Gary Gartenberg, P.E. at 4, annexed to the Declaration of Tate J. Kunkle as **Exhibit "1"**.

circumstantial evidence; (3) identified the objective findings and empirical data showing a contamination of their properties; and (4) sufficiently identified and quantified of contamination of their real property plaintiffs' claim is attributable to defendants' operations.  This is not the record of a party who continuously disobeyed a court order or refused to comply with a discovery order.  To the contrary, plaintiffs' submittals provide the information to meet their discovery burdens at this stage in the litigation and pursuant to the MSO.

> **B.     The sanctions defendants seek are particularly harsh and disproportionate in light of plaintiffs' submittals.**

Despite plaintiffs' disclosure pursuant to the MSO, defendants move this Court to sanction plaintiffs by striking plaintiffs' expert reports and dismissing plaintiffs' case.  As an aside, plaintiffs submit that defendants are also strictly liable under the Navigation Law for their release of petroleum hydrocarbons into waters of the State, which is one of the causes of action set forth in plaintiffs' complaint.  In any event, defendants' motion seeks the dismissal of plaintiffs' case because they claim plaintiffs' expert submissions did not comply with the Court's MSO.

First and foremost, as described above, plaintiffs completely complied with the requirements of the MSO by providing expert testimony on the issues of causation and identifying the contamination in plaintiffs' water caused by defendants.  Defendants' motion is really addressing the *weight* of plaintiffs' experts' evidence and essentially argues that their experts are *more right* than are plaintiffs' experts.  Such a battle of the experts is the province of the jury, not the Court and should certainly not be dispositive on a summary or discovery motion.

Moreover, the sanctions sought by defendants are extremely harsh in light of the record before the Court.  In the Second Circuit, such extreme sanctions are typically issued in only the rarest of cases where there has been a willful disobedience of discovery orders by the party at

fault.  *See generally Spence v. Maryland Cas. Co.*, 803 F.Supp. 649, 661 (W.D.N.Y. Aug. 26, 1992) *aff'd,* 995 F.2d 1147 (2d Cir. 1993).

Defendants mistakenly and improperly rely on the unreported decision in *Strudley v. Antero Res. Corp.,* No. 2011-CV-2218 (Colo. Dist. Ct. May 9, 20120) ("*Strudley*"), a Colorado state court decision that is currently on appeal, as somehow controlling the instant matter. Def. Memo at 24.  As an initial matter, the *Strudley* court's reliance to how the *Lone Pine*[31] Court handled the particular case it was addressing was particularly misplaced on a Rule 37 motion to dismiss.  The *Lone Pine* decision was not the result of a discovery sanction but was, rather, brought pursuant to New Jersey's Rule 1:4-8 concerning frivolous litigation.  *See Lore v. Lone Pine Corp.,* No. L-33606-85, 1986 WL 637507, *1 (N.J. Super. Nov. 18, 1986).

Secondly, the *Strudley* trial court did not find sanctionable conduct by those plaintiffs as governed by Rule 37.  Instead, the Colorado trial court concluded that the *Strudley* plaintiffs failed to make a *prima facie* claim for *physical injuries*, and as a result, dismissed all of plaintiffs' claims, including the Strudleys' property damage claims sounding in nuisance and trespass.  That trial court's ruling as shown by the record was manifestly arbitrary, unfair and/or unreasonable.  There was no serious discovery misconduct by the Strudleys at all.[32]  Similarly here, there is no flagrant misconduct by these plaintiffs that would result in the unduly harsh sanctions of striking their expert reports or dismissal of their case for an alleged discovery violation.

---

[31] *Lone Pine* case management orders receive their name from the unreported New Jersey trial court decision in *Lore v. Lone Pine Corp.*, No. L-33606-85, 1986 WL 637507 (N.J. Super. Nov. 18, 1986).  *Lone Pine* involved a group of property owners who sued some 464 defendants who alleged personal injuries and property damage.

[32] Indeed, the *Strudley* plaintiffs have timely appealed the Colorado trial court's decision.  A decision on that appeal is forthcoming.

There is one sole question pending before the Court on defendants' motion and that is whether plaintiffs have fulfilled the requirements of MSO.  Because plaintiffs made such submissions in strict adherence with the MSO, defendants' motion should be denied.  Dismissal of plaintiffs' property related causes of actions based on defendants' unsupported claims that plaintiffs somehow violated the Court's discovery order is simply unprecedented in the Second Circuit.  There are neither *Daubert* challenge nor motions *in limine* before this Court.  Plaintiffs provided sufficient evidence in support of their *prima facie* case and in compliance with the MSO.

One of defendants' main arguments is that plaintiffs have not and cannot establish causation through their expert reports.  This argument is not only wrong because Mr. Rubin explains the causation and how defendants' contamination got into plaintiffs' water wells, it is also misplaced and inappropriate on motions brought under Rule 16(f) or Rule 37(b) for an Order striking and/or dismissing plaintiffs' complaint as a discovery sanction.

As an initial matter, proximate causation is an issue for the trier of fact to resolve and is not appropriate to be addressed on a motion for discovery sanctions.  *Sawyer*, 196 F. Supp. 2d at 227.  To that end, "[p]roof of proximate causation requires evidence that the result was a reasonably foreseeable consequence of the defendant's action."  *People v. Sadacca*, 128 Misc. 2d 494, 499 (Sup. Ct., N.Y. Cty., 1985).  Plaintiffs must generally show that "the defendant's negligence was a substantial cause of the events which produced the injury."  *In re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*, 591 F. Supp. 2d 259, 266 (S.D.N.Y. 2008).  In New York, "[a] plaintiff need not eliminate every other possible cause" in order to establish proximate causation.  *Id.*  Further, showing that defendant's negligence was a substantial factor "need not be made with absolute certitude nor exclude every other possible cause of injury."  *In*

16

*re Methyl Tertiary Butyl Ether (MTBE) Products Liab. Litig.*, 739 F. Supp. 2d 576, 607-08

(S.D.N.Y. 2010).  Therefore, substantively and procedurally, defendants' arguments that

plaintiffs cannot show causation through its experts should fail.

Dismissal with prejudice is a severe sanction that would not be supported by the record.

Here, plaintiffs' submittals do not reflect a willful disobedience of the discovery rules, bad faith

consisting of a flagrant disregard of a party's discovery obligations, or culpable fault consisting

of at least gross negligence in failing to comply with those discovery obligations. *DePalma v.*

*Nike, Inc.*, 1998 WL 690880 (N.D.N.Y. Sept. 30, 1998) ("Strong sanctions should be imposed

only for serious violations of discovery orders; however, such sanctions are justified where a

failure to comply with a court order is due to willfulness or bad faith, or is otherwise culpable.").

To the contrary, plaintiffs' submittals comply exactly with the Court's discovery order.  If the

Court finds that plaintiffs have somehow disobeyed the MSO, the Court should consider

alternatives and the least severe sanction to ensure full compliance with the Court's discovery

orders before it dismisses plaintiffs' case.  *See generally Bartnick v. CSX Transportation, Inc.*,

2013 WL 1113991 (N.D.N.Y. Mar. 18, 2013).

## CONCLUSION

For the foregoing reasons, plaintiffs respectfully request that the Court deny defendants'

Motion to Strike and/or Dismiss Pursuant to Rules 16(f) and 37(b) of the Federal Rules of Civil

Procedure.


Dated:  New York, New York
        May 13, 2013

                        Respectfully submitted,

                        NAPOLI BERN RIPKA SHKOLNIK & ASSOC., LLP
                        *Attorneys for the Plaintiffs*


            By: _____
                        Tate J. Kunkle


                        350 Fifth Avenue, Suite 7413
                        New York, New York 10118
                        (212) 267-3700