UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

| | |
|---|---|
| JASON BAKER, JOHN BREWSTER,<br>JOANN BREWSTER, MAXINE CONDON, KAREN<br>FARRELL, BROOKS LIDDIARD, JANET LIDDIARD,<br>JAMES McDERMOTT, PAUL MOREY, DONETTA<br>MOREY, JOE TODD, BONNIE TODD, TOM<br>WHIPPLE and PAULINE WHIPPLE, | DECISION AND ORDER<br>ON MOTION FOR<br>RECONSIDERATION<br>11-CV-6119 CJS |

                    Plaintiffs,

vs.

ANSCHUTZ EXPLORATION CORPORATION,
JOHN AND JANE DOES 1 THROUGH 100,

                    Defendants.

_____

**APPEARANCES**

| | |
|---|---|
| For Plaintiffs: | Jose A. Almanzar, Esq.<br>Katherine E. Mayo, Esq.<br>Marc J. Bern, Esq.<br>Tate James Kunkle, Esq.<br>Bettina L. Hollis, Esq.<br>Napoli Bern Ripka Shkolnik & Associate, LLP<br>350 Fifth Avenue Suite 7413<br>New York, NY 10118<br>(212) 267-3700 |
| For Defendant: | Michael N. Mulvania, Esq.<br>Aaron M. Panner, Esq.<br>Mark C. Hansen, Esq.<br>Michael J. Guzman, Esq.<br>Saritha K. Tice, Esq.<br>Kellogg Huber Hansen Todd Evans & Figel PLLC<br>1615 M Street, N.W. Suite 400<br>Washington, DC 20036<br>(202) 326-7900 |

Christopher D. Thomas, Esq.
Nixon Peabody LLP
Clinton Square
P.O. Box 31051
Rochester, NY 14603
(585) 263-1087

# INTRODUCTION

**Siragusa, J.** This action alleging negligence and other related causes of action involving a gas drilling company is before the Court on Plaintiffs' motion for reconsideration of the Court's Decision and Order of December 17, 2014. Notice of Motion of Plaintiffs for Reconsideration of the Court's Order of December 17, 2014, Feb. 11, 2015, [ECF No. 145](). Plaintiffs' ask the Court to reverse its decision to exclude the testimony of Plaintiffs' expert, Paul Rubin, and its grant of Defendant's motion for summary judgment. For the reasons stated below, Plaintiffs' application is denied.

# FACTUAL BACKGROUND

The Court's prior decision, *Baker v. Anschutz Exploration Corp.*, No. 11-CV-6119-CJS, 2013 U.S. Dist. LEXIS 90394 (W.D.N.Y. Jun. 27, 2013), set out the factual background in detail and will not be repeated here. The basis for Plaintiffs' reconsideration application are as follows:

> I. The Court Committed An Error Of Law And An Error Of Fact When It Made Mapping The Contaminants' Exact Fracture Pathway The Admissibility Standard For Rubin's Testimony Because Rubin Is A Highly Experienced Hydrogeologist Who Used Well-Accepted Methodology To Arrive At His Conclusion And Because A Reliable Scientific Methodology For Identifying The Precise Deep Fracture Pathways Does Not Exist.
>
> II. The Court Should Not Have Disregarded Rubin's Explanation That The Drilling And Shut-In Of Dow #1 Caused Outward Pressure On The Formation Because That Testimony Is Based On Scientific Fact.
>
> III. The Court Failed To Consider The Fact That The Particulate Matter In Plaintiffs' Wells Has The Same Chemical Makeup As That Commonly Found In Natural Gas Wells.

IV. The Court Would Misapply The Law Should It Exclude Rubin's Opinion Regarding The Isotopic Testing As Untimely.

## STANDARDS OF LAW

*Motion for Reconsideration*

As the Fifth Circuit has recognized, "[t]here is no motion for 'reconsideration' in the Federal Rules of Civil Procedure." *See Hamilton Plaintiffs v. Williams Plaintiffs*, 147 F.3d 367, 371 n. 10 (5th Cir. 1998). Since the Federal Rules of Civil Procedure do not expressly provide for motions for reconsideration, such a motion may be construed as a motion to alter or amend judgment under Rule 59(e) or Rule 60(b). *See Osterneck v. Ernst & Whinney*, 489 U.S. 169, 174, 109 S. Ct. 987, 103 L. Ed. 2d 146 (1989).

> The standard for granting such a motion [for reconsideration] is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court.... [A] motion to reconsider should not be granted where the moving party seeks solely to relitigate an issue already decided.

*Shrader v. CSX Transp., Inc.*, 70 F.3d 255, 257 (2d Cir. 1995).

Further, "Rule 60(b) is designed to strike a balance between serving the ends of justice and preserving the finality of judgments. A motion for relief from judgment is generally not favored and is properly granted only upon a showing of exceptional circumstances." *Freedom, N.Y., Inc. v. United States*, 438 F. Supp. 2d 457, 462 (S.D.N.Y.2006) (citations and internal quotations marks omitted).

## ANALYSIS

*Defendant's Motion in Limine to Exclude Expert Testimony of Paul Rubin*

Rule 702 governs the district court's responsibility to ensure that "any and all scientific testimony or evidence admitted is not only relevant, but reliable." *Daubert*, 509 U.S.,589, 113 S. Ct. 2786. In its prior Decision, the Court noted that Rubin's report did not discuss how drilling the bore hole for Dow # 1 interconnected bedrock fractures or

3

faults with Plaintiffs' water wells and that "while Rubin examined the faults he could see above ground in the area, he did not identify any particular fault or fracture that resulted in interconnection of Dow # 1 with Plaintiffs' aquifer." *Baker v. Anschutz Exploration Corp.*, 68 F. Supp. 3d 368, 377 (W.D.N.Y. 2014). The Court determined that Rubin failed to explain how the bore hole, which was lined by a steel and cement casing, was capable of interconnecting the below-ground faults, allowing gas to move from 10,000 feet underground to Plaintiffs' relatively shallow water wells. When asked, "So am I understanding you correctly that the problems that Plaintiffs are experiencing were not caused, in your view, by any problem in the vertical portion of either well?" Rubin responded, "That's right, that's my understanding." Rubin Dep. 248:7–13. Therefore, Rubin must be concluding that the horizontal portion, which was about 10,000 feet underground, connected vertical faults allowing gas to migrate up to the water wells, especially when Dow # 1 was capped. Rubin testified:

> So the thing is people there had their wells without any problems for half a century and then in three months time or maybe six months time, looking beyond the Plaintiffs, we have reason to believe the conditions changed, and that's how I envisioned it happening, a somewhat leaky fault system, a tortuous route, a build up of natural gas within the water, um, the fact that there is, you know, a certain amount of overburden, the fracture interconnection when it gets far enough up is convoluted, it's reasonable to assume it didn't have to happen overnight.

Rubin Dep. 227:6–20. When asked about how he identified the method by which the gas migrated up almost two miles to Plaintiffs' wells, Rubin testified:

> A. The region is known to be heavily faulted, there are faults present. Whether, I don't know which exact one it is following or which exact joint set gas follows, the area is recognized as being heavily fractured.
>
> Q. And you made no attempt to try to figure out which fault or fissure it's coming up through?
>
> A. I[t] would be almost impossible for me to personally do without exten-

4

sive seismic instrumentation or something like this that's below the ground surface.

*Id.* 231:10–22. Finally, Rubin was asked at his deposition to read the last sentence from paragraph 17 of his report and was questioned about what he wrote, giving the following answers:

> Q. Why don't you read for us the last sentence that you wrote in paragraph 17.
>
> A. "Elevated methane concentrations in Plaintiffs' wells coincident with penetration of the Black River formation, provide proof that fault pathways between the two interconnect them."
>
> Q. What you are saying there in that last sentence is that because of the timing of what you think are elevated methane concentrations for the first time in Plaintiffs' wells shows that those fault pathways exist; right?
>
> A. There must be a way to get these high concentration thermogenic gasses up there that have caused these problems that were not preexisting before Dow 1's installation.
>
> Q. Right, and because of timing, that is when the Dow 1 penetrated the Black River formation, that's why you think both of these faults exist and why you blame the Dow 1 for the problem?
>
> MR. KUNKLE: Objection.
>
> Q. Right?
>
> MR. KUNKLE: Objection.
>
> A. As I see it the only thing that has changed in this physical setting that could be a cause of what changes observed in Plaintiffs' wells and natural gas concentration is the installation of Dow 1.
>
> Q. Timing is what—
>
> A. Timing is critical and that the vectors for gas migration do exist.

297:18–299:6. Rubin was asked about whether temporal proximity was the basis for his conclusion in the following questions and answers:

> Q. …And the reason that you say the Dow 1 is the cause is because of timing, it was drilled and a couple months later the Plaintiffs started seeing

5

> these problems that in your view were far different and greater than what they had seen before?
>
> A. Not timing alone. Timing, location, the, uh, the presence of faults, faults going through the Syracuse salt formation known in the area, based on Beinkafner's work,[1] all these, the variability of numbers, the change in water clarity in homeowners' wells, the change in water relative to fizziness, all the things that suddenly, in a relatively short period of time, became evident, yes.

Rubin Dep. 300:24–301:17. Essentially, Rubin relies heavily on temporal proximity and his assumption that preexisting faults were somehow interconnected by Dow # 1's horizontal path. However, his theory does not address the two separate laboratory tests of the gas samples from some of Plaintiffs' wells which showed that the gas in the water wells was not the same type of gas found in the Trenton-Black River formation. Rubin Dep. 305:14–309:11. Rubin explained that he discounted the isotope data "because I view it as not likely incorporating mixing phenomenon that should be more adequately assessed by a chemist." Rubin Dep. 309:12–15. He then conceded he was not qualified to critique the labs' work. Rubin Dep. 309:19–21. Rubin was asked about the gas samples taken during the vertical drilling and admitted he "didn't bother to grapple with any of this in [his] reports," Rubin Dep. 315:8–9, then responded to the following question with the following answer:

> Q. Is this [gas sample collection] completely irrelevant to your conclusions in your view?
>
> A. Not completely irrelevant. It may have more relevance than I have given it.

---

[1] At his deposition, Rubin was asked about the work of his friend and colleague, Dr. Katherine Beinkafner, and he stated that although he consulted with her, he did not cite her thesis or her work in either of the two affidavits he prepared for this case, and further stated, "[b]ut actually I could say there would have been no reason to because, uh, it came as a surprise to me that one of the arguments she made was that the Syracuse formation was something that would stop all gas migration, for example, so whereas I knew that that wasn't the case it was useful to talk with her about the exact information that documents that." 33:20–34:5.

6

Rubin Dep. 315:11–15. Rubin also agreed that an isotopic analysis of the gas found in Plaintiffs' wells would be another way to analyze causation, stating: "It would be if a chemist agreed that, indeed, that was sufficient." Rubin Dep. 322:16–17. He also agreed with the questioner that, "it would at least be more than [he] did…" to establish Dow # 1 as the cause of the gas in Plaintiffs' well water. Rubin Dep. 322:19–21.

Regardless of whether Rubin tested the gas in the wells, or ignored the test results, the Court's conclusion that his expert report failed to convince the Court of its reliability stands. A lay person could come to the same conclusion by simply observing where the well ended up, and the temporal proximity of Plaintiffs' water problems. Rubin's supplemental report ¶ 18, [ECF No. 133-6](ECF No. 133-6), concludes that "[e]levated methane concentrations in Plaintiffs['] wells coincident with penetration of the Black River Formation provide proof that fault pathways between the two interconnect them." Later in the same supplemental report at ¶ 37, he wrote "[w]hile the exact lateral and vertical extent of high-angle and strike-slip faulting present is not known, gas migration to Plaintiffs' wells documents the connection." As the Court pointed out in its first decision, Rubin's circular reasoning fails to reveal a sufficiently rigorous analytical connection between his methodology and his opinion.

Upon reconsideration of Rubin's reports and his deposition testimony, the Court finds no reason to change its prior ruling. The Court stands by its decision that Rubin's testimony at trial would not be based upon sufficient facts or data, would not be the product of reliable principles and methods, and that, in any event, Rubin has not applied the principles and methods reliably to the facts of the case. Therefore, his testimony

7

would not be admissible. Fed. R. Evid. 702. Plaintiffs' motion for reconsideration is granted, and upon reconsideration, the Court reaffirms its prior decision.

*Summary Judgment*

In view of the Court's reaffirmation of its decision to preclude Plaintiffs' expert report, there is no reason to reconsider the decision to grant summary judgment.

## CONCLUSION

For the foregoing reasons, the Court grants Plaintiffs' motion for reconsideration, and on reconsideration, reaffirms its prior decision.

IT IS SO ORDERED.

Dated: March 15, 2016
      Rochester, New York      /s/ Charles J. Siragusa
                                         CHARLES J. SIRAGUSA
                                         United States District Judge